

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC - 6 2019

CLERK, U.S. DISTRICT COURT
By_____
　　　　　　　Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRISTOPHER JACOB GONZALEZ, §
　　　　　　　　　　　　　　　§
　　　　　　Petitioner, §
　　　　　　　　　　　　　　　§
v. §　　No. 4:18-CV-950-A
　　　　　　　　　　　　　　　§
LORIE DAVIS, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
　　　　　　　　　　　　　　　§
　　　　　　Respondent. §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Christopher Jacob Gonzalez,
a state prisoner confined in the Correctional Institutions
Division of the Texas Department of Criminal Justice, against
Lorie Davis, director of that division, respondent. After having
considered the pleadings, state court records, and relief sought
by petitioner, the court has concluded that the petition should
be denied.

### I. FACTUAL AND PROCEDURAL HISTORY

In 2013 petitioner was charged with continuous sexual abuse
of Anna and Belinda, children younger than 14 years of age, in
Tarrant County, Texas, Case No. 1320894D.[1] (Clerk's R. 7.)

---

[1]The state appellate court referred to the children and family members
by pseudonyms. This court refers to the children and family members by those
same pseudonyms.

Petitioner's jury trial commenced on May 20, 2014. The state appellate court summarized the factual and procedural background of the case as follows:

> Anna and Belinda are the daughters of Adam and Whitney. Adam's sister Esperanza is married to [petitioner], and they have three children, Luiz, Melanie, and Natalie. From 2009–2013, [petitioner], Esperanza, and their adult daughter Natalie periodically babysat Anna and Belinda while Whitney and Adam were working.

> In early January 2013, while Adam was putting three-year-old Belinda down for a nap, she asked him if he wanted her to pat him on the butt like Uncle Chris. Adam, who had recently seen Belinda slap her sister on the bottom, interpreted Belinda's question to refer to innocent contact of that nature. So Adam disregarded her comment, responded "no," and proceeded to put Belinda down for a nap. It did not occur to him to mention her remark to his wife or anyone else.

> Approximately a week later, on January 15, 2013, while Whitney was putting Belinda down for a nap just after lunch, Belinda blurted out, "Tio Chris made me touch his butt." Whitney testified that she was surprised at Belinda's comment, so she made Belinda repeat it to make sure she heard it correctly. After Belinda repeated herself, Whitney asked her when it happened. Belinda answered that she did not know. Then Whitney asked, "Where did this happen?" and Belinda responded, "At his house." Whitney testified that she questioned her daughter further:

>> A: I said, what part is his butt? And she pointed to herself in her front crotch area.

>> Q: And did you ask her anything else after she pointed there or what happened next?

>> A: I gave her a doll, we had a male Barbie doll and I asked her to show me on him. He was fully dressed and she took off his pants and pointed at the doll's penis.

2

At some point during the course of their conversation Belinda also told Whitney that [petitioner] had done something to Anna. So later that afternoon, after Anna came home from school and finished her homework, her mother sat her down on the couch and began asking her questions:

> A: ... I first asked her if she knew what private parts were and she answered and said yes and pointed to her private parts. I asked her has anybody shown her their private parts and she told me a story about a little boy who came out of the bathroom with his pants pulled down because he didn't know how to buckle his pants at school. And I asked her if any grownups had ever shown her their private parts and she said Tio Chris made me taste his butt one time.
>
> ....
>
> Q: Okay. And did you ask [Anna] anything else after she said that?
>
> A: I asked her to tell me about it and she did. She explained to me that she was at Chris' house in their kitchen. That he had put a blindfold over her eyes and told her to open her mouth, that he was going to give her a Fruit Roll-Up. And she said he unbuckled his pants and put his front butt inside of her mouth instead of the Fruit Roll-Up.
>
> ....
>
> Q: Okay. And did she tell you anything else?
>
> A: She told me that at a different time he had made her touch his front butt[2] under a blanket while they were sitting on a couch—on the couch.
>
> ....

---

[2]According to the appellate court, the children referred to the penis as the "middle part" or "front butt" in speaking about the abuse. (Mem. Op. 3 n.4.)

Q: Okay. So what happened that time?
What did she tell you?

A: She said that they were sitting on
the couch and he covered both of them up with
a blanket, grabbed her hand and put it on his
front butt she calls it.

After her conversation with Anna, Whitney called her
husband, whom she had spoken to earlier in the day
regarding Belinda's revelation. At this point, he came
home immediately. Whitney also called her mother and
asked her to come over. In the meantime, Adam contacted
his sister Esperanza and she came over to the house as
well. According to Whitney, once their father,
grandmother, and aunt had arrived, the girls came into
the living room "one at a time" and repeated their
stories to the adults.

To complicate matters, the girls have two uncles
named Chris. According to their parents, the girls
generally refer to [petitioner], their paternal uncle,
as Tio Chris, but he is sometimes referred to as Uncle
Chris as well. Their maternal Uncle Chris is called
Uncle Chris, but never Tio Chris. In addition, the
girls have a male cousin named Chris.

Both Adam and Whitney testified that they were
able to clarify that both of the girls were referring
to [petitioner] with regard to the incidents of alleged
abuse, and given what the girls had revealed to them
that evening, Whitney and Adam contacted the police the
next morning. An investigation then ensued.

Approximately two weeks later, both girls were
separately interviewed by Joy Hallum, forensic
investigator, at Alliance for Children. Their
interviews were videotaped.

[Petitioner] was charged with continuous sexual
abuse of a child, and the case was tried to a jury.
After the trial court found both Anna and Belinda
competent to testify, both videotaped interviews were
shown to the jury. The jury heard their live testimony
regarding the allegations of abuse as well.

The jury found [petitioner] guilty of continuous
sexual abuse of children younger than 14 years of age

and sentenced him to 43 years' confinement.
(Mem. Op. 2-6.)

The appellate court affirmed the trial court's judgment, the
Texas Court of Criminal Appeals refused petitioner's petition for
discretionary review, and the United States Supreme Court denied
certiorari. (Docket Sheet 2.) Petitioner also filed a
postconviction state habeas-corpus application challenging his
conviction, which was denied by the Texas Court of Criminal
without written order. (SHR,[3] vol. 1, 13-40.) This federal habeas
petition followed.

## II. ISSUES

Petitioner's claims fall within the following general
categories:

(1)   ineffective assistance of counsel (grounds one, two,
      four, five, six, eight, and nine);
(2)   *Brady* violation (ground three); and
(3)   actual innocence (ground seven).

(Pet. 5-7G.)

## III.  RULE 5 STATEMENT

Respondent believes that petitioner has exhausted his state
court remedies with respect to the claims raised and does not
allege that the petition is barred by limitations or subject to
the successive-petition bar. (Resp't's Answer 6.) 28 U.S.C. §§
2244(b), (d) & 2254(b)(1).

---

[3]"SHR" refers to the state court record of petitioner's state habeas
proceeding in WR-88,587-01.

## IV. LEGAL STANDARD FOR GRANTING HABEAS CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute also requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut this presumption by clear and convincing evidence. *Id.*

Further, when the most recent state court to consider a constitutional issue provides a "reasoned opinion," a federal habeas corpus court must "review[ ] the specific reasons given by the state court and defer[ ] to those reasons if they are

6

reasonable." *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188, 1191-92 (2018). If the opinion "does not come accompanied with those reasons," a federal court should "'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Id.* In other words, federal habeas-corpus courts confronted with an unexplained state court decision "are to 'look through' the decision to an earlier state court opinion and presume that the earlier one provides the relevant rationale." *Thomas v. Vannoy,* 898 F.3d 561, 568 (5th Cir. 2018) (citing *Wilson,* 138 S. Ct. at 1192).

Finally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law" in making its decision. *Johnson v Williams,* 568 U.S. 289, 298 (2013); *Richter,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2004).

## V. DISCUSSION

### (1) Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the

effective assistance of counsel at trial and on a first appeal as of right. U.S. Const. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). To establish ineffective assistance of counsel, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state courts have adjudicated the ineffective-assistance claims on the merits, this court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *See Richter,* 562 U.S. at 105; *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases,

the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter,* 562 U.S. at 101.

In grounds one, four, five, six, and nine, petitioner claims that the state court unreasonably concluded that trial counsel rendered effective assistance in various respects. Specifically, petitioner asserts, *verbatim*:

> (1) The State Court unreasonably concluded contrary to Supreme Court precedent that trial counsel rendered effective assistance in not challenging for cause bias juror who could not consider the minimum range of punishment of 25 years.

> (4) The State [Court] unreasonably held trial counsel rendered effective assistance in not requesting continuance to investigate belated expert opinion on child incompetence to testify.

> (5) The State Court unreasonably concluded trial counsel rendered effective assistance in not asserting rights of confrontation to the State's hearsay objection.

> (6) The State Court unreasonably concluded trial counsel rendered effective assistance in not adequately investigating underlying facts of the charge in the indictment.

> (9) The State Court unreasonably concluded trial counsel rendered effective assistance against factual basis included in the Court of Appeals opinion page 8, that trial counsel elicited no testimony with regard to child witness preparation by her parents through cross-examination.

(Pet. 6-7, 7C-7D, 7G.)

Petitioner was represented at trial by Lynda Tarwater and

Stacey Mooring. He raised his ineffective-assistance-of-counsel claims in his state habeas application and, in support, presented, among other things, the affidavit of Robbie McClung, a local criminal defense attorney who reviewed the case at petitioner's behest. The state habeas judge, who also presided at petitioner's trial, referred the case to a magistrate judge for hearing, factual findings, and recommendation, which were later adopted by the state habeas judge. (SHR, 2nd Supp. R., 10.) The magistrate judge ordered affidavits from counsel and held two live evidentiary hearings, the first in February 2018 and the second in May 2018. Tarwater responded to petitioner's ineffective-assistance claims via affidavit and testified at both live hearings. Moore submitted a near-identical affidavit but did not testify at the live hearings.

In her affidavit, Tarwater detailed her representation of petitioner and responded to his allegations, in relevant part, as follows (any spelling, grammatical, and/or punctuation errors are in the original):

### Part I.
### Factual and Chronological Summary of the Case and
### My Efforts on [Petitioner]'s Behalf

On or about April 15, 2012, I was contacted by Alex Gonzalez, father of the [petitioner], about representing his son, [petitioner], in a charge of continuous sexual assault against a child and a charge of indecency with a child that were brought against him. Prior to contacting me, [petitioner] had retained attorney Patty Tillman who had represented him briefly, including accompanying [petitioner] to a polygraph

examination, which she says "was an epic failure." I met with [petitioner] and his father on or about April 20, 2012, and told them what I would charge to handle this type of case. A few days later, Alex Gonzalez called me on the phone and tried to get me to accept the case for less money. I declined and we signed a service agreement on April 22, 2012. I contacted Patty Tillman and informed her I would be filing a Motion to Substitute Counsel.

I immediately began reviewing the police reports, CPS reports and medical reports. I conducted many interviews with [petitioner] and requested the forensic interviews of the children. I reviewed the forensic interviews with [petitioner] and we began an in-depth review of the allegations, family members who might be involved and family history. A Grand Jury Packet was prepared and submitted pre-indictment. Numerous in-person interviews were conducted with [petitioner] and his immediate and extended family in my office. I engaged a private investigator firm, Paula Green & Associates as well as an testifying expert, Dr. Aaron P. Pierce. As evidence of a bandana used in one of the offenses began to surface and a family member stated she possessed it, I immediately engaged the services of Cellmark Forensics Laboratory to test for DNA. I subpoenaed phone records from numerous parties. Photographs of the alleged premises were taken. Hours of research were spent. All appropriate motions were filed, including a Motion for a Competency Hearing. Briefs were prepared. All alternate theories were explored and a defense strategy was formed with the agreement of [petitioner]. A mock jury selection was held with approximately twenty (20) attendees to test voir dire questions and responses.

After the jury returned a guilty verdict and sentenced [petitioner] to 43 years in prison, I filed [petitioner]'s Notice of Appeal. I suggested interviewing several appellate attorneys to [petitioner]'s father. Alex Gonzalez hired Danny Burns for the appeal, one of the appellate attorneys on the list of recommendations. When oral argument was made by Danny Burns before the Appellate Court, I attended along with [petitioner]'s family and a woman with whom [petitioner] had a relationship. [Petitioner]'s wife and children did not attend.

The Second Court of Appeals affirmed the lower court's decision. Mr. Gonzalez, [petitioner]'s father, understandably persisted in trying to find a way to free his son. However, his methods became desperate and less than ethical. Mr. Gonzalez went to Danny Burns' office and tried to get Mr. Burns to say that trial counsel was ineffective on a concealed tape recorder. Mr. Gonzalez then attempted to get me to meet with him in person. I declined.

Mr. Gonzalez eventually hired Mr. Hoak who also attempted to meet with me. I declined again, given the untrustworthy behavior of Mr. Gonzalez and his demonstrated willingness to resort to hidden tape recorders. Mr. Hoak requested my client file but gave no date by which he needed it, then reported me to the State Bar for not providing it sooner. The State Bar graciously called me and agreed it was more likely a misunderstanding. I provided the file Mr. Hoak requested, paid $83 to have it copied, and had it hand delivered to his office.

I now respond to this Application for Habeas Corpus, which I understand [petitioner] has filed with an incomplete record by not attaching to his application any affidavits. Per the Court's Memorandum and Order, I provide the following responses to [petitioner]'s allegations of ineffective assistance of trial counsel.

## Part II.
## Response to Each of [Petitioner]'s Specific Allegations

1. **[Petitioner] was denied effective assistance of counsel when trial counsels failed to challenge for cause a biased juror who could not consider the minimum punishment of 25 years.**

Trial counsel's voir dire strategy was to find jurors who would carefully consider issues related to guilt/innocence more than to punishment. This strategy was formulated with the consent and input of [petitioner] in that he maintained his innocence from the date of my representation throughout trial. During trial counsel's lengthy and thorough hour-and-a-half voir dire of the panel, Brittany Long, Prospective Juror No. 15, was considered an acceptable jury prospect because of her willingness to judge the

credibility of a child witness. This was important because we had two child witnesses, ages three and five at the time of the offense, whom counsel believed had credibility issues and even issues as to their competency to testify. Counsel also had an expert witness appointed by the Court, Dr. Aaron P. Pearce, Ph.D., LPC, LSOTP, who testified that children the ages of the State's child witnesses were neither credible nor reliable. Prospective Juror Long stated she was willing to evaluate the witnesses' credibility, stating in one response that she could only convict if she believed the testimony of a child witness. Paramount to trial counsel's defense strategy were jurors who would not automatically believe a child simply because they were a child. It was clear to counsel that Ms. Long would be such a juror and would consider the credibility, reliability and competency of the two children. When questioning the panel about how to judge the credibility of a witness, Ms. Long volunteered by raising her hand and stated, "I would say based on the details of their testimony. If they are really vague, then you probably can't necessarily trust what they are saying. As well as if they can give you specific information – then I trust them more, if they can give you details on what they are describing." Counsel expected the children would provide conflicting details because of the forensic interviews they had given. For instance, the younger of the two girls did not consistently distinguish between the truth and a lie or real and unreal, and the competency of both witnesses was questioned by the forensic interviewer. Joy Hallum with Alliance for Children indicated that [Belinda] could not distinguish between real and unreal and between truth and a lie. For instance, [Belinda] believed calling a cow a pig was right and if someone called her a boy, that statement would also be right. Trial counsel considered these statements to be vague and unreliable as to the child witnesses' recall and memory of exactly what happened.

Ms. Long also inquired about a unanimous verdict, and stated that if she was confused or did not know the answer, she would have to return a not guilty verdict. Ms. Long also indicated that if there was disagreement by the jury on a punishment of specific years, namely two jurors wanted different terms of punishment, then there would have to be a unanimous compromise. This led counsel to believe that she would be willing to

compromise as it related to length of punishment if it became necessary. Counsel believed her willingness to compromise would be an important factor if punishment was reached.

It must also be noted that both the Court and the State questioned the jury panel regarding consideration of the entire range of punishment for Continuous Sexual Abuse of a Child, Aggravated Sexual Assault of a Child, and Indecency with a Child. At no point during that examination did Ms. Long indicate she could not consider the full range of the individual punishments. Counsel believed Ms. Long was vacillating as a prospective juror on the issue of the minimum range of punishment for Continuous Sexual Abuse of a Child, and would conform and compromise on the issue if necessary. After reviewing the entire record of the voir dire process (not just writ counsel's attached excerpt), it was consistent with trial counsel's strategy not to exercise a challenge for cause to eliminate Ms. Long.

(SHR 101-02.)

. . .

**4.    [Petitioner] was denied effective assistance of trial counsel, because trial counsels did not file a sworn motion for continuance to obtain additional time to further investigate this written State's expert opinion that opined that the child witnesses were not competent to testify.**

It must first be noted that the trial counsel was focused on the issue of the competency of the two child witnesses from the onset of its representation. Trial counsel filed a Motion for Exculpatory and Mitigating Evidence on October 29, 2013. Second, a Motion to Determine the Competency of Witnesses was filed on March 7, 2014, specifically requesting a pre-trial hearing for the determination of the competency of the child witnesses. However, the Court determined in that hearing that both girls were competent to testify. Counsel had repeatedly reviewed the forensic interviews of both children, in which clear issue was raised regarding their competency. This issue was fully examined, investigated and discussed with [petitioner] and his family during several meetings prior to trial.

Trial counsel conducted hours of research and a brief on the competency of the two child witnesses was prepared. Trial counsel's strategy regarding competency focused on a number of issues, specifically three issues raised by research of case law. First, there was a lack of capacity to recollect the events displayed by both girls. Second, there was a lack of ability shown by the girls to intelligently observe the events. And finally, there was a lack of capacity shown by both girls to narrate the events. Inconsistent details included dates, times, places where the assaults were alleged to have occurred and even how those assaults occurred. Argument at the end of the Judge's examination of the witnesses' competency was requested and denied. Had counsel been allowed to argue the issue of competency, it would have raised the three-prongs that are used to determine competency and would have offered specific examples of the inconsistent details that arose during the forensic interviews. A document confirming the issue with the child witnesses' competency was presented approximately ten minutes before the examination of the forensic interviewer. The document merely confirmed counsel's position on competency and an issue that had already been researched and briefed and for which extensive cross-examination outlines were prepared.

A Motion for New Trial was filed in which the issue of competency of the witnesses was again raised and specifically, the issue of the determination by Joy Hallum that the girls were incompetent. This information had been withheld for some seven months. However, the issue needed no further investigation as alleged by writ counsel. Rather, the Alliance for Children interview notes in which Joy Hallum indicated the State's two child witnesses were incompetent were used to cross examine Ms. Hallum. The testimony of Dr. Pearce was also presented to question the credibility, reliability and competency of the child witnesses. Defense counsel saw no need for a continuance to further investigate an issue that had been fully investigated, raised and argued.

5. **[Petitioner] was denied effective assistance of counsel when trial counsels failed to assert his right of confrontation to the State's hearsay evidence objection or make an offer of proof or argument to support the questioning of the**

**complainants.**

The Confrontation Clause is applicable when out of court statements by witnesses that are testimonial are barred unless witnesses are unavailable and Defense counsel did not have a prior opportunity to cross-examine them. No such issues were present here. Both the State and Defense witnesses were present to testify, available for direct and cross-examination, and the jury was able to observe their demeanor as they testified. Counsel, as a continuing part of its trial strategy, contested the objections that were largely sustained by the Court. However, this trial strategy also included a decision to avoid contesting each and every hearsay objection and instead, allow the jury to observe and realize that the State was attempting to preclude valuable testimony and evidence from being admitted. Even when thwarted by the State's numerous objections, trial counsel was able to present the testimony and gravamen of its case through questions and examination of other witnesses.

The purpose of the entire cluster of rights associated with the Confrontation Clause is to ensure the reliability of the evidence. Trial counsel and [petitioner] reviewed the forensic interviews of both the alleged victims on numerous occasions in preparation for their cross-examinations. Objections by the State, specifically to limit the testimony by "Belinda," were overcome with continued examination and cross-examination of other witnesses. Additionally, inconsistencies by both child witnesses were addressed when, as part of trial strategy, counsel chose to introduce the forensic interviews of each child. Trial counsel ensured that all pertinent witnesses were present and subject to cross-examination and confrontation through a complete and focused subpoena process, which included calling twelve (12) witnesses to the stand. All witnesses who could provide relevant testimony were present, called and subjected to cross-examination. This is the essence of confrontation.

In response to the examples cited on page thirty-one (31) of the Writ Application claiming the State's objection denied [petitioner] the right to confrontation, that objection was overcome by re-wording and continuing to examine both child

witnesses. The purpose of counsel's cross-examination
was to exhibit to the jury that the witnesses had been
subjected to suggestibility through repeated
questioning by parents, professionals, officers and
other family members. Counsel also intended to show
that the overly charged emotional environment on the
day of the outcry could affect the veracity and recall
of the children's memory. In addition, the testimony
that counsel attempted to get from the children was
later elicited from the children's mother, aunt and the
defense expert witness, Dr. Aaron Pierce. Therefore,
the intended testimony was admitted into trial through
alternative witnesses despite the State's attempt to
keep it out. No right of confrontation was denied and
no offer of proof was required.

. . .

**7.    [Petitioner] was denied effective assistance of
       trial counsel because counsel did not properly
       investigate the underlying facts of the charge and
       the indictment.**

In more than a dozen pre-trial meetings with
[petitioner] and all members of his immediate and
extended family, the issue of misidentification was
examined and thoroughly investigated. This was one of
the two core issues of trial counsel's strategy, along
with the competency and credibility of the two child
witnesses. Six of the twelve witnesses subpoenaed by
the defense provided testimony as to the multiple Uncle
Chrises as it created the clear possibility of
misidentification.

One Uncle Chris is Christopher Cook, the maternal
uncle of the two child witnesses. Trial counsel
carefully considered the possibility that he might be
the offender. Trial counsel hired Paula Green &
Associates, Private Investigators to interview and
investigate Chris Cook, his father, mother and
girlfriend. The investigation of the entire family was
predicated upon the fact that Chris Cook and his
girlfriend resided with the elder Cook family who
frequently babysat the children. Chris Cook and his
mother, Maureen Cook, were subpoenaed and cross-
examined. Both child witnesses were cross-examined and
specifically, "Belinda" was questioned regarding some
statements she made about her Uncle Chris Cook and the

games they played, including pillow fighting, use of an I-Pad and importantly, tricking her with candy.

Trial counsel also subpoenaed Chris Chavera, a cousin of the two child witnesses on their father's side whom "Belinda" referred to as "Uncle Chris." The younger child witness referred to Chris Chavera as cousin Chris, whom she confusingly stated became her Uncle because he was born before she was and so he became her uncle. Chris Chavera lived with the maternal grandparents of the child witnesses instead of his own parents because his father had forced him to leave home alleging his son was homosexual. Trial counsel had both Chris Chavera and his father investigated. Investigators for the defense also examined allegations of continuous sexual assault of Chris Chavera by his father, as well as possible sexual assault of other young males in the Chavera family. Investigators examined the fact that Chris Chavera lived in [petitioner]'s home with [petitioner]'s wife and children for a period of several months, again raising the issue of misidentification because the Gonzalez' frequently babysat the child witnesses, and did so while Chris Chavera lived with them.

Extensive testimony was also solicited by trial counsel from Dr. Pierce regarding the two child witnesses' ages and the possibility of confusion as to their identification of the culpable Uncle Chris. This issue was completely examined and explored throughout trial. However, on more than one occasion, the child witnesses identified [petitioner], including by naming his children, his wife and his residence.

Writ counsel mentions that there was "some evidence that a complainant alleged that the alleged abuse continued after [petitioner] did not have access to the Complainants after the initial outcry." At no time prior to trial, during the trial process or following the trial was trial counsel every [sic] notified, advised or aware of such an allegation.

. . .

**10.  [Petitioner] was denied effective assistance of trial counsel, because as noted on page 8 of the Court of Appeals opinion trial counsel elicited no testimony with regard to what witness preparation**

**of "Belinda" a child complainant by her parents through cross examination.**

It should be noted that writ counsel's statement of this issue initially appears nonsensical because he conflates two issues: 1) whether or not trial counsel sufficiently developed testimony during cross-examination of the parents regarding trial preparation of the children; and 2) the relevancy of such testimony to the judge. The relevancy of such testimony would only matter to the jury since the trial was before the jury and not the bench. That said, the issue of coaching of the child witnesses by their parents to prepare for trial was, in fact, examined through cross-examination of both child witnesses. As concerns "Belinda," she was asked who talked to her about her testimony before trial and she stated her parents did. Trial counsel asked her what her parents told her and the State objected as to hearsay. The Court sustained the objection. The younger child was similarly cross-examined and she too admitted she had discussed testimony with her parents before trial. However, there was no trial strategy to question the parents further regarding coaching or trial preparation. Trial counsel believed the parents would merely deny such allegation even if true. Alternatively, trial counsel's strategy was to develop this testimony through other witnesses and through the consistency of the girls' testimony with their forensic interviews. When the mother of the children was asked about the frequency of questioning and discussion of the events during the two weeks prior to the forensic interviews, she stated that is was not discussed much at all. Therefore, trial counsel deemed the forensic interviews would have been more spontaneous and candid with little preparation/coaching. Rather, trial counsel was more concerned with the shaping of the child witnesses' stories at the point of outcry given the number of family members involved in questioning, replaying of events and the emotion in the situation. Since the children's testimony at trial did not deviate from the forensic interviews, which occurred at least two weeks after the outcry and were conducted in a calmer environment without coaching by the interviewer, trial counsel relied more on whether the testimony on the stand deviated from these interviews. Had the testimony in court deviated from the forensic interviews, counsel would have suspected coaching of the witnesses to

prepare for trial and would have found the matter more highly probative when the parents were on the stand. Without such deviation, trial counsel considered the continued examination of the parents regarding coaching stood only to re-affirm the girls' consistency before the jury and repeat the girl's testimony before the jury unnecessarily.

Even if any preparation had occurred, trial counsel would agree with the Court of Appeals when it stated in its opinion in this case, "for 'Belinda's parents to prepare her to testify in court in front of a jury is not surprising since preschool children normally do not understand our judicial system."

(SHR, vol. 1, 100-07 (citations omitted).)

Based on the record, counsel's affidavits, and Tarwater's testimony at the live hearings, the magistrate judge entered the following factual findings, which although numerous are included to assist the reader:

Challenges for Cause

. . .

7.  Counsel challenged juror No. 36 for cause because he "[c]ould not consider the minimum under any circumstances on any of the three cases."

8.  Counsel challenged juror No. 30 for cause because "(s]he repeated several times she couldn't consider the minimum on any of the three cases."

9.  Counsel challenged juror No. 56 for cause because he stated he could not consider the minimum punishment.

10. Counsel challenged juror No. 44 for cause because he could not consider the minimum punishment.

11. Counsel challenged juror No. 55 for cause because he could not consider the minimum punishment.

12. Juror No. 15, Ms. Brittany Long, stated that that

[sic] she was "no, on the low end" of punishment.

13. Ms. Long stated that she could convict if she "believed the child's testimony."

14. Ms. Long indicated that she believed that, if a witness, regardless of who they are, was really vague, "you probably can't necessarily trust what they are saying."

15. Ms. Long believed that "if they can give you specific information -- then I trust them more, if they can give you details on what they are describing."

16. Ms. Long inquired about a unanimous verdict and acknowledged that she was required to follow the law.

17. Ms. Long stated that if the jury doesn't "know the answer, [it] ha[s] to say not guilty."

18. While Ms. Long stated she could not consider the minimum during punishment, she stated that she would vote not guilty, if at the end of guilt/innocence, she did not know the answer.

19. Ms. Long indicated that she understood that, if two jurors wanted different terms of punishment, then there would have to be a compromise.

20. Based on Ms. Long's statements, counsel concluded that she would be willing to compromise as to the length of punishment if it became necessary.

21. Counsel believed Ms. Long's willingness to compromise was an important factor.

22. Counsel's voir dire strategy was to find jurors who would carefully consider the issues related to guilt/innocence more than to punishment.

23. Counsel's goal during voir dire was to find jurors who could be fair and unbiased and who would not immediately believe the victims because they were "cute little [children]."

24. Counsel specifically looked for jurors that would

not give a child's testimony automatically more weight than an adult.

25. Counsel wanted jurors that could keep an open mind and not just believe what the victims said because they were children.

26. Counsel wanted jurors who could remain open to the theory that the investigation could have been "contaminated."

27. Counsel chose not to challenge Ms. Long for cause because "she indicated that she would not believe a child's testimony just because it was a child, and that was a critical standard" counsel "was looking for."

28. Counsel also chose not to challenge Ms. Long because Ms. Long stated that she would follow the law.

29. Counsel's decision to not challenge Ms. Long for cause was the result of reasonable trial strategy.

30. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel challenged Ms. Long for cause.

Motion for Continuance

31. Joy Hallum ("Hallum"), an employee for Alliance for Children, conducted forensic interviews of the "Anna" and "Belinda."

32. On May 21, 2014, immediately before the court held the hearing on whether Hallum was an expert witness, Hallum advised the prosecutor that Alliance for Children had an interview information sheet that included [petitioner]'s date of birth on it.

33. The prosecutor sent her investigator to obtain the interview information sheet from Alliance for Children.

34. The prosecutor received the Alliance for Children's interview information sheet before

Hallum testified in front of the jury.

35. The prosecutor gave the Alliance for Children's interview information sheet to [petitioner]'s counsel about ten minutes before Hallum testified in front of the jury.

36. The Alliance for Children's interview information sheet is not part of the Writ record.

37. The Alliance for Children's interview information sheet included a circle around the word "incompetent" regarding "Belinda."

38. Hallum circled "incompetent" after performing a video recorded interview of "Belinda."

39. Hallum interviewed "Belinda" on January 31, 2013.

40. The trial court held the victims' pre-trial competency hearing on May 21, 2014.

41. The trial court did not allow the parties to participate in the 601 [competency] hearing.

42. "Belinda's" competence during her initial interview was irrelevant to the pretrial competency hearing sixteen months later.

43. During direct examination, the prosecutor asked Hallum about the fact that she circled that "Belinda" appeared to not be competent.

44. During cross-examination, [petitioner]'s defense counsel was able to question Hallum about the fact that Hallum did not find "Belinda" competent when she interviewed her.

45. [Petitioner]'s defense counsel was not surprised by the indication that Hallum did not find "Belinda" competent during the forensic interview because that was clear to defense counsel when they viewed the forensic interview.

46. [Petitioner]'s defense counsel knew from the substance of the forensic interview that there was an issue regarding "Belinda's" competency.

47. [Petitioner]'s defense counsel was able to effectively cross-examine Hallum even though they had only received the Alliance for Children interview information sheet before Hallum testified because defense counsel was already prepared to cross-examine Hallum regarding whether "Belinda" was competent.

48. Counsel did not request a continuance to investigate Hallum's credibility notation because they were already aware of the basis for the notation and there was nothing further for them to discover.

49. Counsel's decision to not request a continuance was the result of reasonable trial strategy.

50. [Petitioner] presents no evidence as to what additional evidence counsel would have discovered had counsel requested a continuance after learning about Hallum's credibility notation.

51. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel requested a continuance.

Confrontation Clause

52. Part of counsel's trial strategy was to avoid contesting each and every hearsay objection and, instead, allow the jury to observe and realize that the State was attempting to preclude valuable testimony and evidence from being admitted.

53. Counsel's consideration that they did not want to over-object was reasonable.

54. Counsel was able to present the testimony and gravamen of their defense through questions and examination of other witnesses.

55. The jury was able to observe the demeanor of the witnesses as they testified.

56. Counsel were able to address the inconsistencies of both child witnesses through the admission of the forensic interviews of each child.

24

57. Counsel used the subpoena process to call twelve witnesses and ensure that all pertinent witnesses were present and subject to cross-examination and confrontation.

58. Counsel was able to overcome the State's objections by rewording and continuing to examine both child witnesses.

59. The purpose of counsel's cross-examination was to exhibit to the jury that the witnesses had been subjected to suggestibility through repeated questioning by parents, professionals, officers, and other family members.

60. Counsel attempted to show the jury that the overly charged emotional environment on the day of the outcry could affect the veracity and recall of the children's memory.

61. Counsel was able to get in testimony through the children's mother, aunt, and the defense expert, Dr. Aaron Pearce.

62. Counsel did not make a Confrontation Clause objection, or make an offer or [sic] proof, because they were able to get the intended testimony in through alternative witnesses.

63. Counsel's objections were the result of reasonable trial strategy.

64. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel made a Confrontation Clause objection.

. . .

Investigation

68. Counsel conducted more than a dozen pre-trial meetings with [petitioner] and all members of his immediate and extended family.

69. Counsel reviewed the police reports, CPS reports and medical reports.

70. Counsel conducted many interviews with [petitioner].

71. Counsel requested and reviewed the forensic interviews of the children.

72. Counsel reviewed the forensic interviews of the children with [petitioner].

73. Counsel conducted an in-depth review of the allegations and the family members who might have been involved.

74. Counsel investigated the family histories.

75. Counsel prepared and submitted a Grand Jury Packet to the State preindictment.

76. Counsel contracted with Cellmark Forensics Laboratory to test a bandanna for DNA as there was evidence that it may have been used during one of the offenses.

77. Counsel subpoenaed phone records from numerous parties.

78. Photographs of the alleged premises were taken.

79. Counsel conducted hours of legal research regarding the issues in this case.

80. Counsel considered alternate theories and formed a defensive strategy.

81. Counsel examined and investigated the issue of misidentification.

82. Six of the twelve witnesses subpoenaed provided testimony as to the multiple "Uncle Chrises" as it created the clear possibility of misidentification.

83. Counsel investigated Christopher Cook and carefully considered the possibility that he might have been the offender.

84. Counsel hired Paula Green and Associates to interview and investigate Christopher Cook, his

father, mother, and girlfriend.

85. Ms. Green's investigation of the entire family was
predicated upon the fact that Christopher Cook and
his girlfriend resided with his family who
frequently babysat the children.

86. Christopher Cook and his mother, Maureen Cook,
were subpoenaed and cross-examined.

87. One of the victims was questioned regarding
statements she made about Uncle Chris Cook and the
games they played, including pillow fighting, use
of an iPad and tricking her with candy.

88. Counsel subpoenaed Chris Chavera, a cousin of the
two child witnesses on their father's side whom
one of the children referred to as "Uncle Chris."

89. Counsel had both Chris Chavera and his father
investigated.

90. Counsel's investigator examined allegations of
continuous sexual assault of Chris Chavera by his
father, as well as possible sexual assault of
other young males in the Chavera family.

91. Counsel examined the fact that Chris Chavera lived
in [petitioner]'s home for a period of several
months which raised the issue of misidentification
because the victims were frequently babysat at
[petitioner]'s home while Chris Chavera lived
there.

92. Counsel hired Dr. Pearce regarding the child
victims' ages and the possibility of confusion as
to their identification of the culpable "Uncle
Chris."

93. The issue of the multiple Chrises was fully
examined and explored throughout trial.

94. As part of their preparation for trial, counsel
assembled a large group to conduct a mock jury
voir dire.

95. There is no evidence that the abuse of the victims
occurred after the initial outcry and [petitioner]

did not have access to them.

96. Counsel was unaware of any allegations that the victims were continued to be abused after [petitioner] was removed from the equation.

97. Counsel's investigation was the result of reasonable trial strategy.

98. [Petitioner] presents no evidence as to what additional evidence counsel would have discovered had they done additional investigation.

99. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel done additional investigation.

100. [Petitioner] presents no evidence to support his claim that there was evidence that "Belinda" was coached by her parents.

101. Counsel attempted to raise the issue of coaching through the testimony of the child victims.

102. Both victims were questioned regarding who talked to them about their testimony and they both stated their parents did.

103. Counsel chose not to ask the victims' parents about whether they coached the victims because counsel believed the parents would merely deny such preparation even if true.

104. Counsel's strategy was to demonstrate the victims were coached by the testimony of other witnesses and through the consistency of the victims' testimony with their recorded forensic interviews.

105. Counsel asked the victims' mother about the frequency of the questioning and discussion during the two weeks prior to the forensic interviews and the mother stated it was not discussed much at all.

106. Counsel concluded that the forensic interviews were conducted in a "calmer environment" and were more spontaneous and candid, with little

preparation or coaching.

107. In light of the circumstances, counsel believed that any deviation from the forensic interviews to the testimony at trial would have been evidence of coaching.

108. Had there been deviation from the forensic interviews to testimony at trial, counsel would have found the matter highly probative when the parents were on the stand.

109. Because there was little deviation between the forensic interview and the victims' testimony, counsel concluded that the continued examination of the parents regarding coaching stood only to reaffirm the victims' consistency before the jury.

110. Counsel felt that continued questioning regarding the issue would only repeat the victims' testimony before the jury unnecessarily.

111. Counsel's decision not to ask the victims' parents about how they coached the victims was the result of reasonable trial strategy.

112. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel questioned the victims' parents more about how they coached the victims.

113. Ms. Tarwater's testimony and affidavit were credible and supported by the record.

114. Mr. Mooring's affidavit is credible and supported by the record.

115. Ms. McClung's testimony and affidavit as to what Ms. Tarwater and Mr. Mooring should have done in this case is irrelevant to this ineffective assistance of trial counsel inquiry.

116. Ms. McClung's testimony and affidavit are given no weight.

117. Ms. Tarwater's actions were the result of reasonable trial strategy.

118. Mr. Mooring's actions were the result of reasonable trial strategy.

119. There is no credible evidence that [petitioner]'s counsel's representation fell below an objective standard of reasonableness.

120. There is no evidence that a reasonable likelihood exists that the result of the proceeding would have been different but for the alleged misconduct.

(Id. at 259-70, 290-91 (record citations omitted).[4])

Based on these findings, and applying the *Strickland* standard, the magistrate judge concluded that counsel's actions and omissions were the result of reasonable trial strategy and that petitioner failed to prove either prong of the *Strickland* test. (Id. at 277-81.)

Petitioner has not presented clear and convincing evidence to rebut the state courts' factual findings and, contrary to his assertion, the state courts' findings are adequately supported by the record. Thus, this court must defer to those findings.[5]

---

[4]Findings of facts nos. 23, 26, 46, and 106 were adopted as modified.

[5]Petitioner asserts that the presumption of correctness under § 2254(e)(1) should not apply because ineffective-assistance-of-counsel claims are mixed questions of law and fact. (Pet'r's Mem. 8.) The presumption of correctness however applies to the historical facts underlying the ultimate conclusion of law in a state court's determination of a mixed question of fact and law. *See Sumner v. Mata,* 455 U.S. 591, 597 (1982). Thus, background fact findings made in the course of determining the issue of ineffective assistance of counsel are subject to the presumption of correctness of § 2254(e)(1) and may be rebutted only by clear and convincing proof. *See Perillo v. Johnson,* 79 F.3d 441, 445-46 (5th Cir. 1996). Petitioner also asserts that the presumption should not apply because the state court's factual findings are not supported by the record. (Id.) The current statute eliminated the exceptions to the presumption of correctness listed in former 28 U.S.C. § 2254(d), including the exception that allowed a federal court to disregard a state court finding of fact if the finding was not supported by the record. *Compare,* current 28 U.S.C. § 2254(e)(1) and former 28 U.S.C. § 2254(d). The statute now simply

30

Having done so, the state court's application of *Strickland* was not objectively unreasonable. It is irrelevant that another attorney might have made other choices or handled the issues differently. As the United States Supreme Court has noted, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. Further, petitioner's claims are conclusory, with no legal and/or evidentiary basis, refuted by the record, involve strategic and tactical decisions made by counsel, and/or would have required counsel to make frivolous objections or arguments, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or objections); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue").

---

declares "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A federal court must apply the presumption of correctness until the petitioner rebuts the presumption with clear and convincing evidence. *Id.*

A trial attorney can be considered ineffective for failing to challenge veniremembers who specifically state that they cannot be fair and impartial to the defendant. *Virgil v. Dretke,* 446 F.3d 598, 609-610 (5th Cir. 2006). However, an attorney's "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983). Clearly, counsel used strikes on jurors whom in her professional opinion were less desireable from the defensive standpoint.

Nor is there anything in the record to suggest that counsel should have sought a continuance to further investigate the competency of the child complainant(s) after disclosure of Hallum's initial determination that Belinda was incompetent. Counsel's duty is to reasonably investigate or make a reasonable decision that no further investigation is necessary. *See Strickland,* 466 U.S. at 691. Counsel was well aware of the issue at the onset of the case, consulted with and hired an expert on the issue, moved for a competency hearing as to both complainants, and fully researched the issue. Given the information known to counsel at the time, the court sees no reason for counsel to have believed further investigation of the issue was necessary, and petitioner fails to demonstrate that

further investigation would in fact have revealed additional information beneficial to his defense. *See Strickland,* 466 U.S. at 691; *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir. 1994). Although Belinda may have been "incompetent" prior to or during her interview with Hallum, this fact alone is not enough to render a child witness incompetent to testify. It was the jury's role to determine what, if any, bearing the fact had on her credibility, or the weight given her testimony, at trial. *See* Tex. R. Evid. 601.

Petitioner's claim that counsel's failure to object to the trial court's ruling sustaining the state's hearsay objections violated his right to confront the child complainants would have required counsel to make frivolous objections. Counsel attempted to elicit testimony from Anna and Belinda on cross-examination regarding the questions that their mother asked one or both of them after Belinda made her outcry. The state objected on hearsay grounds and the trial court sustained the objections. The Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses against him. *See Davis v. Alaska,* 415 U.S. 308, 315 (1974). No violation of the Confrontation Clause occurs when, as here, a hearsay declarant testifies at trial and is subject to cross-examination. *United States v. Owens,* 484 U.S. 554, 560 (1988). Whitney, the complainants' mother, testified at petitioner's trial and was subject to cross-examination.

Furthermore, counsel's decision not to object in every instance in which a viable objection might be lodged falls within the range of reasonable trial strategy. And, because counsel was able "to present the testimony and gravamen of their defense through questions and examination of other witnesses" and "overcome the State's objections by rewording and continuing to examine both child witnesses," petitioner cannot satisfy the second prong of *Strickland.*

Lastly, petitioner's claim that counsel failed to adequately investigate the underlying facts of the case—namely, alternative suspects, is conclusory and refuted by the record.

Under grounds two and eight, petitioner claims that appellate counsel was ineffective by failing to raise the issue of the competency of both Anna and Belinda in his petition for discretionary review and the competency of Anna on direct appeal. (Pet. 6, 6B, 7F.) Petitioner was represented on appeal by Danny Burns. Burns was not called to testify at the evidentiary hearings, but responded to the allegations in an affidavit presented in the state habeas proceedings as follows (any spelling, grammatical, and/or punctuation errors are in the original):

> In the brief before the Second Court of Appeals I raised six points of error:
>
> 1.    THE TRIAL COURT ABUSED HIS DISCRETION IN ALLOWING THE TESTIMONY OF THE CHILD WITNESS [BELINDA] WHO WAS NOT COMPETENT TO TESTIFY.

2. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILTY FOR THE REASON THAT THE ALLEGATIONS AGAINST [PETITIONER] WERE NOT PROVEN BEYOND A REASONABLE DOUBT BY COMPETENT AND ADMISSIBLE EVIDENCE.

3. THE TRIAL COURT DENIED [PETITIONER] THE RIGHT TO CONFRONT HIS ACCUSERS BY SUSTAINING A LEGITIMATE CROSS-EXAMINATION QUESTION ON THE GROUNDS OF HEARSAY.

4. THE TRIAL COURT DENIED [PETITIONER] THE RIGHT TO CONFRONT [ANNA] BY SUSTAINING A LEGITIMATE CROSS-EXAMINATION QUESTION ON THE GROUNDS OF HEARSAY.

5. THE TRIAL COURT VIOLATED [PETITIONER'S] RIGHT TO DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY DENYING HIS REQUEST TO PRESENT ARGUMENTS ON THE OBJECTION TO THE COMPETENCY OF THE CHILD WITNESSES.

6. [PETITIONER] WAS TRIED UNDER AN UNCONSTITUTIONAL STATUTE THAT DENIES HIM HIS CONSTITUTIONAL RIGHT TO UNANIMITY OF THE JURY VERDICT WHEN THE STATUE DOES NOT REQUIRE THE JURORS UNANIMOUSLY TO AGREE ON WHICH SPECIFIC ACTS OF SEXUAL ABUSE WERE COMMITTED BY [PETITIONER].

I believed these were the only arguable points that were preserved in the trial court record.

Petitioner's new counsel complains of the failure to raise the issue of competency in the Petition for Discretionary Review. The issue of proving a witness is incompetent rests upon the party seeking to prove incompetence. When, as here, the competence of a witness is challenged, the trial court must establish in the record that the child knows right from wrong, be able to understand the questioning, formulate or frame intelligent answers, and must be able to understand the moral responsibility of telling the truth. The trial court in this case asked the usual questions of understanding the difference between a truth and a lie, then asking a question if calling her shirt pink would be a truth or a lie and she said it would be truth but if the Judge said her shirt was orange, that would be a lie. The trial court went over those type questions and determined that the child was competent. The competence

of a child to testify is in the eye of the beholder and trying to get an appellate court to overrule a trial judges determination that the child is competent if [sic] futile at best. The real issue in the case at that point was the constitutionality of Article 22.01 of the Penal Code that allows a defendant to be convicted on a less than unanimous jury. The Court of Criminal Appeals turned down the PDR and we appealed to the Supreme Court of the United States and Certiorari was denied.

The Second Court of Appeals addressed the issue of the child's competence correctly and to have raised the issue in the PDR would have weakened the PDR in my opinion and I explained this to the family before I filed the Petition for Discretionary Review.

(SHR 116-18 (citations omitted).)

Based on counsel's affidavit and the documentary record, the magistrate judge entered the following findings of fact (any spelling, grammatical, and/or punctuation errors are in the original):

125. Mr. Burns concluded the six issues he raised the only arguable points that were preserved in the trial court record.

126. Mr. Burns did not raise the issue that the Court of Appeals erred regarding the competency of "Belinda" in his petition for discretionary review because the Court of Appeals properly addressed and analyzed the competency issue.

127. Mr. Burns concluded that raising in the petition for discretionary review that the Court of Appeals erred regarding the trial court's competency finding, when it properly analyzed the issue, would weaken the issues raised in the petition for discretionary review.

128. Mr. Burns' decision to not raise in the petition for discretionary review that the Court of Appeals erred when it affirmed the trial court's competency finding when the Court of Appeals addressed the issue correctly was the result of reasonable

36

appellate strategy.

129. There is no evidence that a reasonable likelihood exists that the outcome of the petition for discretionary proceeding would have been different had counsel attacked the Court of Appeals' ruling regarding the trial court's competency finding.

. . .

132. Mr. Burns did not raise the issue of competency of "Anna" on direct appeal because he concluded that any issue would be futile.

133. Mr. Burns concluded that trial court asked "Anna" the proper questions, followed the proper protocols, and concluded that she was competent to testify.

134. Mr. Burns raised the issue of competency regarding "Belinda" because she was younger and there were specific examples in the record that she was not competent.

135. Mr. Burns felt the real issue in this case was to attack the constitutionality of article 22.01 of the Texas Penal Code.

136. Mr. Burns decision to not raise the issue of the competency of "Anna" but raise the issue of "Belinda's" competency was the result of reasonable appellate strategy.

137. Mr. Burns' affidavit is credible and supported by the record.

138. There is no evidence that a reasonable likelihood exists that the outcome of the appellate proceeding would have been different had counsel raised an issue regarding the trial court's competency finding of "Anna."

(Id. at 271-72 (citations omitted).)

Based on these findings, and applying the *Strickland* standard, the magistrate judge concluded that counsel's decision to not raise

the issues on appeal was the result of reasonable appellate strategy and that petitioner failed to prove either prong of the *Strickland* test. (Id. at 281-83.)

Petitioner has not presented clear and convincing evidence to rebut the state court's factual findings. Thus, this court must defer to those findings. Having done so, the state court's application of *Strickland* was not objectively unreasonable. To prevail on an ineffective-assistance-of-appellate-counsel claim, a petitioner must prove that (1) counsel failed to raise a particular nonfrivolous issue that was clearly stronger than issues that counsel did present and (2) had counsel raised the issue, he would have prevailed on appeal. *See Smith v. Robbins,* 528 U.S. 259, 288 (2000). Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes,* 463 U.S. 745, 751-753 (1983). Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court. *See Smith v. Robbins,* 528 U.S. 259, 288 (2000).

Counsel believed that the appellate court properly analyzed the competency issue as to Belinda, and there is no evidentiary basis for petitioner's claim that Anna was incompetent to testify. Appellate counsel is not ineffective for failing to present a

futile issue on appeal. *See Styron v. Johnson,* 262 F.3d 438, 449 (5th Cir. 2001). Additionally, in most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors. Counsel raised the issues he believed had been preserved for appellate review and upon which he believed might be successful. Petitioner fails to establish that the issues he now raises were stronger.

**(2) *Brady* Violation**

In ground three, petitioner claims that the "State Court unreasonably concluded that no *Brady* violation by the state on belated information of child witnesses incompetent to testify." (Pet. 7.) According to petitioner,

> [he] references [his] motion for new trial and supporting affidavit of trial counsel that the State only turned over the exculpatory 'Brady' Material after the child witness was questioned by the Court at the sub rosa hearing. This action denied [petitioner] of his right to further investigate this evidence. [Petitioner] submits that the competency to testify of two minor complainant witnesses was objected to by the defense. The issue of competency to testify was heard pre-trial. There existed expert opinion testimony in the possession of the State that there was a lack of competency of the complainants to testify. The expert opinion was expressed in a written document that was not turned over to the defense until after the competency hearing. This failure to timely turn over "Brady material favorable to the defense denied [petitioner] his right to due process under the 5th 6th and 14th amendment to the U.S. Constitution. This act denied [petitioner] time to further investigate this issue with the State's expert witness and or other potential witnesses to support the defense's position that the witnesses were incompetent to testify. [Petitioner]'s due process rights were violated under the 14th Amendment to the U.S. Constitution and Art. 1 sec. 9 or 10 of the Texas Constitution.

(Id. at 7-7A.)

The *Brady* violation that petitioner alleges was the state's late disclosure of Hallum's "interview information sheet" reflecting that Belinda was deemed "incompetent" at the time of her videotaped interview. The magistrate judge entered the following factual findings regarding this issue:

140. On May 21, 2014, immediately before the court held the hearing on whether Hallum was an expert witness, Hallum advised the prosecutor that Alliance for Children had an interview information sheet that included [petitioner]'s date of birth on it.

141. The prosecutor sent her investigator to obtain the interview information sheet from Alliance for Children.

142. The prosecutor received the Alliance for Children's interview information sheet before Hallum testified in front of the jury.

143. The prosecutor gave the Alliance for Children's interview information sheet to [petitioner]'s trial counsel about ten minutes before Hallum testified in front of the jury.

144. The Alliance for Children's interview information sheet is not part of the Writ record.

145. The Alliance for Children's interview information sheet included a circle around the word "incompetent" regarding "Belinda."

146. Hallum circled "incompetent" after performing a video recorded interview of "Belinda."

147. Alliance for Children has been described an a "nonprofit [organization] in Tarrant County" that "work[s] with collaboration efforts with Child Protective Services, with law enforcement, with the district attorney's office, with a specialized team, [ and] with Cook's Children's Medical Center called the CARE Team when there's allegations of

child abuse."

148. The purpose of the Alliance for Children is to work in collaboration with "investigations concerning child abuse."

149. While the building houses Alliance for Children, a District Attorney's Office, a police department office, and a Cook's Children's Hospital office, only the "forensic interview staff, as well [as] their family advocate program" are actually employed by Alliance for Children.

150. The Alliance for Children "deals with sexual abuse cases, any cases of physical abuse that meet the needs or of CPS -- of a -- referral to law enforcement. And essentially any case in which CPS and law enforcement are -- are doing an investigation together."

151. Alliance for Children staffs its cases to make sure the needs of the children and families are met, including, but not limited to, if the child needs medical attention or counseling.

152. [Petitioner] presents no evidence that Hallum was an investigative agent for the government.

153. Hallum interviewed "Belinda" on January 31, 2013.

154. The trial court held the victims' pre-trial competency hearing on May 21, 2014.

155. The trial court did not allow the parties to participate in the 601 hearing.

156. There is no evidence, or authority, that evidence of "Belinda's" competence during her initial interview was relevant to a competency hearing sixteen months later.

157. There is no evidence that the Alliance for Children's interview information sheet was favorable or material to the pre-trial competency hearing.

158. There is no evidence that a reasonable probability exists that the outcome of pre-trial competency

hearing would have been different had the Alliance for Children's interview information sheet been disclosed sooner.

159. During direct examination, the prosecutor asked Hallum about the fact that she circled that "Belinda" appeared to not be competent.

160. During cross-examination, [petitioner]'s defense counsel was able to question Hallum about the fact that Hallum did not find "Belinda" competent when she interviewed her.

161. [Petitioner]'s defense counsel was not surprised by the indication that Hallum did not find "Belinda" competent during the forensic interview because that was clear to defense counsel when they viewed the forensic interview.

162. [Petitioner]'s defense counsel knew from the substance of the forensic interview that there was an issue regarding "Belinda's" competency.

163. [Petitioner]'s defense counsel was able to effectively cross-examine Hallum even though they had only received the Alliance for Children interview information sheet before Hallum testified because defense counsel was already prepared to cross-examine Hallum regarding whether "Belinda" was competent.

164. There is no evidence that a reasonable probability exists that the outcome of the trial proceeding would have been different had [petitioner] received the Alliance for Children interview information sheet sooner because the information was presented to the jury and counsel was able to effectively cross-examine with it.

165. There is no evidence of a *Brady* violation.

166. There is no evidence that the State committed prosecutorial misconduct.

(SHR 272-75 (record citations omitted).[6])

_____

[6]The findings of fact are set forth as modified. (Id. at 290-91.)

Based on these findings, and applying *Brady v. Maryland,* 373
U.S. 83 (1963), its progeny, and relevant state law, the magistrate
judge entered the following legal conclusions in recommending
denial of the claim:

57.  A prosecutor has an affirmative duty to disclose
favorable evidence that is material either to guilt
or punishment.

58.  "Under its present incarnation, to succeed in
showing a *Brady* violation, an individual must show
that (1) the evidence is favorable to the accused
because it is exculpatory or impeaching; (2) the
evidence was suppressed by the government or
persons acting on the government's behalf, either
inadvertently or willfully; and (3) the suppression
of the evidence resulted in prejudice (i.e.,
materiality). Evidence is material to guilt or
punishment "only if there is a reasonable
probability that, had the evidence been disclosed
to the defense, the result of the proceeding would
have been different." "A 'reasonable probability'
is a probability sufficient to undermine confidence
in the outcome."

59.  It is well-settled that the government may be
charged with the knowledge of its investigating
agents.

60.  "Even if the prosecutor was not personally aware of
the evidence, the State is not relieved of its duty
to disclose because 'the State' includes, in
addition to the prosecutor, other lawyers and
employees in his office and members of law
enforcement connected to the investigation and
prosecution of the case."

61.  [Petitioner] has failed to prove that Joy Hallum
was a member of law enforcement.

62.  [Petitioner] has failed to prove that Joy Hallum
was acting on the government's behalf.

63.  The prosecutor immediately turned over the Alliance
for Children's interview information sheet as soon

as she learned of its existence.

64. [Petitioner] has failed to prove that the State suppressed evidence.

65. A pretrial witness competency examination is not a "critical stage" of a defendant's trial "mandating the participation of his counsel in order to ensure either the fairness of, or the effectiveness of his counsel at, the subsequent trial

66. "Rule 601(a)(2) provides that children 'shall be incompetent to testify' if, 'after being examined by the court, [they] appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated. Under this provision, '[t]he party seeking to exclude the witness from testifying must raise the issue of his competency and shoulders the burden of establishing incompetency.' The competency of a child-witness is a preliminary question for the trial court to determine under Rule 104(a) of the Texas Rules of Evidence, and the trial court is not bound by the rules of evidence in making that determination . . . . But the language of Rule 601(a)(2) certainly does not, on its face require the trial court to permit party participation. And there is no particular reason why it should, since the typical inquiry into a child-witness's capacity to relate facts and appreciate the virtue of veracity is hardly complex."

67. [Petitioner] has failed to prove that the Alliance for Children's interview information sheet regarding "Belinda's" competence was relevant to the competency hearing sixteen months later.

68. [Petitioner] has failed to prove that the Alliance for Children's interview information sheet was favorable or material to the pre-trial competency hearing.

69. [Petitioner] has failed to prove that there is a reasonable probability that the result of the competency hearing would have been different had the Alliance for Children's interview information sheet been disclosed before the pre-trial competency hearing.

70. Because the State used the Alliance for Children's interview information sheet during direct examination, it was not a surprise to [petitioner]'s trial counsel because they watched the videos the information were based on, and [petitioner]'s trial counsel had sufficient amount of time to use the information sheet during cross-examination, [petitioner] has failed to prove that a reasonable probability that the result of the proceeding would have been different had the interview information sheet been disclosed earlier.

71. [Petitioner] has failed to demonstrate a *Brady* violation.

72. [Petitioner] has failed to prove that the State committed prosecutorial misconduct.

(Id. at 283-85 (citations omitted).)

Petitioner has not presented clear and convincing evidence to rebut the state court's factual findings. Thus, this court must defer to those findings. Having done so, the state courts' determination of the issue comports with federal law as determined by the United States Supreme Court.[7] And, while the Supreme Court has not expressly held that evidence that is turned over to the defense during trial has been "suppressed" within the meaning of *Brady,* the Fifth Circuit has held that such evidence is not considered to have been suppressed, so long as "the evidence is received in time for its effective use at trial." *See Powell v. Quarterman,* 536 F.3d 325, 335 (5th Cir. 2008); *United States v. Walters,* 351 F.3d 159, 169 (5th Cir. 2003). Here, whether the

---

[7]To the extent petitioner claims violation under the Texas Constitution or state laws, the claim presents no cognizable basis for federal habeas-corpus relief and is not addressed. See 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

evidence is favorable or material is irrelevant because the evidence was clearly not suppressed. Petitioner learned of the document in time to make effective use of it at trial. The circumstances of this case do not support an extension of *Brady* to last-minute disclosure of evidence.

**(3) Actual Innocence**

In ground seven, petitioner claims that he is actually innocent of the offense. (Pet. 7E.) A stand alone claim of "actual innocence" is itself not an independent ground for habeas-corpus relief. *Herrera v. Collins,* 506 U.S. 390, 400 (1993); *Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006); *Dowthitt v. Johnson,* 230 F.3d 733, 741-42 (5th Cir. 2000). The United States Supreme Court reaffirmed in *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013), that it has not resolved whether a prisoner may be entitled to habeas corpus relief based on a freestanding claim of actual innocence. Until that time, such a claim it not cognizable on federal habeas review under Fifth Circuit precedent. *See Foster v. Quarterman,* 466 F.3d 359, 367 (5th Cir. 2006).

For the reasons discussed,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of

appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED December ___6___, 2019.

_____
JOHN McBRYDE
UNITED STATES DISTRICT JUDGE